ams/jr

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THE ESTATE OF ANTHONY STAPLETON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 03-4166-JAR |
| ) | |
| TED ENSLEY, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND DISMISSING STATE LAW CLAIMS

Anthony Stapleton was a prisoner at the Shawnee County Department of Corrections (DOC) at the time of his suicide.  His estate and survivor now assert violations of his Eighth Amendment rights under 42 U.S.C. § 1983 and negligence under Kansas law.  Plaintiffs seek monetary damages against the following defendants: Officer David Tipton, DOC guard; Sergeant Matthew Biltoft, DOC assistant shift supervisor; Betsy Gillespie, DOC Director of Corrections; and Ted Ensley, Marice Kane, and Victor Miller, Shawnee County Commissioners.  Defendants move for summary judgment (doc. 59): (1) on plaintiffs' deliberate indifference claims; (2) claiming qualified immunity on the § 1983 individual capacity claims; and (3) claiming immunity on the state law negligence claims brought under the Kansas Tort Claims Act (KTCA).

As described more fully below, the Court grants defendants' motion for summary judgment

because there is no genuine issue of material fact in dispute that would sustain individual capacity claims or an official capacity claim under section 1983 against Shawnee County.  Therefore, the Court declines to exercise supplemental jurisdiction and dismisses without prejudice plaintiffs' remaining pendant state law claims.

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]

---

[1] Fed. R. Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Id.* at 251-52.

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[9]

## II.  Background

### A.  Evidentiary Issues

Under the local rules of this district, "[a]ffidavits or declarations [must] be based on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence."[10]  Furthermore, a witness's testimony is only admissible if evidence supports a finding that the witness has personal knowledge of a matter.[11]  "Conclusory and self-serving affidavits are not sufficient."[12]

Defendants object to plaintiffs reliance on plaintiffs' expert's report and affidavit, arguing that it

---

[7]  *Id.*

[8]  *Id.*

[9]  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[10]  D. Kan. R. 56.1(d).

[11]  Fed. R. Evid. 602.

[12]  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)); *see Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991); *Sledge v. Cummings*, 995 F. Supp. 1276, 1283-84 (D. Kan. 1998); *Johnson v. Potter*, No. 01-4182-SAC, 2004 WL 2823237, at *2 (D. Kan. Nov. 10, 2004).

constitutes a legal conclusion, and that opinion testimony is not properly considered on summary judgment.  But, the standard set forth in Fed. R. Civ. P. 56(e) is admissibility; so the Court need only determine if Dr. Lofgreen's statements are admissible.  If so, the Court may consider these statements in determining what facts are uncontroverted and material.

Fed. R. Evid. 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, the Tenth Circuit has held that "[w]hile testimony on ultimate facts is authorized under Rule 704, the committee's comments emphasize that testimony on ultimate questions of law is not favored."[13] The court went on to explain in *Specht v. Jenson*, that the line between admissible and inadmissible evidence regarding legal issues is narrow.[14]  Expert testimony is admissible so long as "the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function."[15] Here, the Court finds that in line with Tenth Circuit precedent, Dr. Lofgreen's opinions are admissible to the extent that they concern his opinions about whether certain actions were in line with established procedure in correctional institutions.  However, the Court finds that any opinion that constitutes a purely legal conclusion is inadmissible and may not be considered on summary judgment.  For example, the Court will not consider paragraphs 4 through 8 of Dr. Lofgreen's report, which are solely

---

[13]  *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc); *see also Simmons Foods, Inc. v. Capital City Bank*, 58 Fed. Appx. 450, 453 (10th Cir. 2003) (explaining the "report was inadmissible as it addressed a question of law, rather than fact, and therefore encroached on the domain of the judge.").

[14]  *Specht*, 853 F.2d. at 809.

[15]  *Id.* at 809-10.

4

conclusory legal allegations that encompass the entirety of plaintiffs' burden of proof.[16]  The Court will

consider statements such as paragraph 9 of the report, which states Dr. Lofgreen's opinions about the

manner in which defendants treated Stapleton in comparison to accepted corrections practices.  These

opinions would be helpful to the trier of fact under Fed. R. Evid. 702 and constitute admissible

evidence.

### B.  Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most

favorable to the non-moving party, the plaintiffs.[17]  The Court relies only upon evidence that is  based

on personal knowledge.

According to the Suicide Prevention Policy (Policy) at DOC, "Suicide Watch" is characterized

as:

> Continuous supervision provided to an inmate who is considered to be at imminent risk for suicide.  When the inmate is assigned to a cell that is protrusion-free, the officer assigned to suicide watch duties shall observe the inmate(s) frequently, at least every 4 minutes, and document the observations as they are completed.

Inmates placed in Suicide Watch must be reviewed by a licensed mental health professional each

---

[16]  *Zuchel v. City & County of Denver*, 997 F.2d 730, 742 -743 (10th Cir.1993) (distinguishing between inadmissible evidence that certain conduct was unconstitutional and admissible evidence that the same conduct was inappropriate based on expert's understanding of established practices and customs).

[17]  The Court takes this opportunity to strongly urge the parties to more thoughtfully present their respective attachments to the briefs in the future.  Labeling all three sets of exhibits in this case alphabetically has made location of any one exhibit a much more cumbersome task for the Court than is necessary.  Additionally, the Court urges the parties to refrain from filing each reference to the summary judgment record as a separate and distinct exhibit.  This practice makes identification of the proper exhibits difficult and creates unnecessary copies of identical documents.  The parties would benefit from a review of D. Kan. R. 56.1 and section IV on Exhibits in the Civil Administrative Procedures Guide for the district.

business day of the week, which review must be documented in progress notes.  In order to be moved

from Suicide Watch to Close Observation, a mental health professional must authorize the transfer.

In contrast, Close Observation entails:

> Close monitoring and supervision of an inmate who is not
> imminently suicidal but who possesses one or more suicide risk factors.
> . . . Staff shall observe these inmates with greater frequency than the
> general population, but at a minimum, shall conduct 15-minute health
> and well-being checks of inmates placed on this status.

Close Observation additionally includes: assignment of inmates to designated Close Observation double

cells; yellow-colored jumpsuits for apparel; supervised razor usage for shaving only; no medicine

allowed inside the cell; and frequent shakedowns of the cell.  The guards on duty in Close Observation

are not informed of each inmate's specific suicidal history.  For inmates under Close Observation,

guards are required to report to a supervisor any behavior that exhibits a suicidal risk factor.  When that

occurs, the supervisor conducts a suicide risk screening and determines if the inmate should stay in

Close Observation or be moved to Suicide Watch.  In addition, "corrections counselors" are required

to speak with each inmate under Close Observation on each business day and document their contact

in a "Close Observation unit log."

Anthony Stapleton was incarcerated in the DOC beginning on October 22, 2002 and was

initially placed in the general population.  The next day, Stapleton was screened by Sergeant Angela

McHardie.  She noted that Stapleton had attempted suicide within the last year by cutting his throat

with broken glass and that he had been treated in the past for "bipolar disorder, ADHD and PTSD."

She further noted that he was currently scared, crying and very upset about his arrest.  She

recommended that Stapleton be placed in the Close Observation Unit, which was located in F Module during the fall 2002.

The next day, Stapleton met with two different screening staff members.  One of these screening staff members, Brad Hillebert, noted that Stapleton told him, "he wants to die that he has no family and nobody cares about him."  Based on Hillebert's recommendation, Stapleton was placed on Suicide Watch.  Four days later, on October 28, licensed Social Worker Leslie Huss assessed Stapleton's risk of suicide.  She noted that he was calm, more upbeat, and not as tearful.  She further noted that Stapleton, "denies current ideation/plans–stated he is feeling much better."  After this assessment, and based on Huss' recommendation, Stapleton was moved back to Close Observation. Stapleton was subsequently screened on November 7, November 23, and November 25.  All of these staff members recommended Stapleton remain in Close Observation.

After Stapleton had been at the DOC for approximately two weeks, Cathy Thomas–his mother–received a call from a guard telling her that Stapleton had not eaten for three days.  The guard allowed him to call his mother in exchange for him eating.  Thomas expressed concern to the guard over the phone and relayed that Stapleton's father had committed suicide.  The guard assured Thomas that Stapleton was safe, as he was in a special unit.  A few days before Stapleton's suicide, a guard called Thomas to tell her that Stapleton asked that he tell her that he loved her.[18]  At that time, Thomas informed the guard of Stapleton's prior suicide attempt.  Progress notes for Stapleton made on November 27 indicate that he was crying at some point that day, but calmed down later.  The

_____

[18]   The record reflects that this phone call occurred sometime between one and four days prior to the suicide.

7

November 28 entry states: "Subject is doing fine spent most of his day socializing with others he talked

about getting high most of day."  A later entry from that day reads: "Subject played scrabble and

socialized with other inmates."

### Tipton and Biltoft

The Policy directs staff to monitor inmates for certain risk factors or behaviors, such as sleeping

difficulties, walking or moving constantly, and weight loss or loss of appetite.  It also requires "all staff

who work directly with inmates" to receive training in recognizing suicide risk factors and behaviors

within the first year of employment and every year after.  Tipton and Biltoft both received suicide

prevention training through the DOC academy.  Biltoft also received in-service training with the DOC.

His training consisted of a video, meetings held by mental health professionals, and consultation with a

suicide expert.

Tipton was a guard on duty in F Module on November 29, 2002.  Tipton's job responsibilities

included observing the inmates, and determining when the inmates might use the restroom, take a

shower, or use the phone.  He was also responsible for conducting a headcount every 15 minutes.

Most of the day, inmates stayed in the dayroom.  The inmates were allowed, with permission, to go to

their cells and shut the doors in order to use the restroom and dress.   Sometimes, inmates covered the

window to their room while they used the restroom.  Although this practice was not sanctioned, it was

not prohibited in writing in 2002.  According to Dr. Lofgreen, "there's no setting–there's no

correctional setting where allowing inmates to place informal screens over their living areas is

acceptable."

Tipton was positioned at the guard station on November 29, where he had a direct view of the

inmates' cells.  The morning of his suicide, Stapleton became agitated and argued with a guard about the size of his jumpsuit.[19]  Tipton relayed to Father Chontos, a priest who volunteered at the DOC, that he had recommended to Biltoft that Stapleton be placed back on Suicide Watch due to this disciplinary problem.  At that time, it was DOC policy to place an inmate who "becomes seriously insubordinate and/or violent" in a protrusion-free cell in Suicide Watch.  Father Chontos understood this to mean that Tipton believed Stapleton was a threat to himself.  Biltoft later met with Stapleton at about 8:45 a.m. regarding the argument, and believing that the situation was resolved, Biltoft determined that it was unnecessary to move Stapleton from Close Observation.  Just before 10 a.m. that morning, Stapleton showered upstairs from F Module.  After he showered, and as he reached the bottom of the stairs, inmate Darrell Myrick heard Stapleton say he was going to kill himself.  Over the course of that week, on two or three occasions, Myrick had heard Stapleton proclaim that he was going to kill himself.  After reaching his cell, Stapleton covered his window with a screen.  Tipton observed this, but believed Stapleton had covered the window because he was using the restroom.

Tipton conducted a headcount at 10 a.m.[20]  Sometime between 10:16 and 10:20, Stapleton's cellmate came to Tipton and reported that the cell door was stuck.  When Tipton approached the cell, he noticed a bedsheet wedged in the door.  When he pulled on the door, he found Stapleton hanging on the other side.  He unraveled Stapleton from the sheet and placed him on the floor.  Tipton proceeded

---

[19]  It is unclear from the record who Stapleton argued with.  Father Chontos' testimony suggests he argued with Tipton, while Sergeant Biltoft's testimony suggests it was another guard.  *See* Doc. 80, ex. B, at 51, ln. 1-5.  Gillespie's deposition testimony suggests the argument was with a guard from a different module.  (Doc. 69, ex. D-5, at 115.)

[20]  The Duty Station Reports for November 29, 2002 include headcheck notations for four different officers.  The last entry on Officer Tipton's report is for 10:00.  The next entry is listed as 10:45 for the officer who used radio number 921.

to call a medical emergency over the radio twice, and performed C.P.R. until medical staff arrived. Tragically, the attempts to revive Stapleton were unsuccessful.

Biltoft was on duty on the day of Stapleton's suicide. At that time, Biltoft was an assistant shift supervisor for the entire adult detention facility. His duties included checking paperwork completed by the guards and patrolling the facility to take care of problems as they arose. When Biltoft arrived at Stapleton's cell shortly after Tipton's emergency call, he observed Stapleton lying on the floor while an inmate conducted chest compressions and Tipton attempted rescue breathing.

### Gillespie and the County Commissioners

Gillespie was hired as Director of the DOC on August 14, 2000. Previously, she was warden of the Larned Correctional Mental Health Facility. At the DOC she was responsible for overall operations at both the adult and juvenile detention centers. During Gillespie's tenure at the DOC, there have been two suicides in addition to Stapleton's; but the record is unclear as to whether these suicides occurred before or after Stapleton's suicide.[21]

During her tenure at DOC, Gillespie consulted with the county commissioners on proposed policy changes to suicide prevention programming. In the Fall of 2001, the DOC hired a social worker for the detention center, who then took the lead in formulating revised DOC policy on suicide prevention. By 2002, with the commissioners' approval, the DOC had a revamped policy, which was in place at the time of Stapleton's suicide. This revamped policy included separation of inmates

---

[21]The Court notes that it has another case before it that concerns a suicide at the DOC in October 2003, almost one year after Stapleton's occurred. *See Vaughn v. Ensley*, No. 04-4083-JAR, filed July 13, 2004. Another case came before Judge O'Hara in 2002: *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1184-88 (D. Kan. 2002), which concerned a prisoner who committed suicide while in Suicide Watch in 1999.

between Suicide Watch and Close Observation, a new system designed on the basis of

recommendations by an expert in the field of suicide prevention.

## III.  Discussion

### A.  Section 1983

Under 42 U.S.C. Section  § 1983, a government official may be sued in his or her individual

capacity for official actions taken under color of state law.[22]  In order to establish individual liability in a

§ 1983 suit, a plaintiff only need show that the official, "acting under color of state law, caused the

deprivation of a federal right."[23]  A defendant sued in her individual capacity may be able to assert

personal immunity defenses such as qualified immunity.[24]

On the other hand, an official capacity suit is another way of pleading an action against the

governmental entity itself.[25]  Municipalities and other local governments, such as counties, may be sued

under § 1983 for constitutional torts.[26]  However, a local government may not be held liable for tortious

acts committed by its employee if the employee committed no constitutional violation.[27]  In order to

establish liability, the government official must have committed a constitutional violation, and the entity

---

[22]  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[23]  *Id.* at 165.

[24]  *Id.*

[25]  *Id*.  The Supreme Court has explained that in an official capacity suit, death or replacement of the named official will automatically trigger substitution of the official's successor.  *Id.* at 166 n.11.

[26]  *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

[27]  This rule is inapplicable, however, if the individual defendants are not liable on the grounds of qualified immunity.  *Id.* at 1317.  "Municipalities enjoy no such shield."  *Id.* (internal quotation omitted).

11

itself must have been the "moving force" behind the alleged deprivation, so the entity's "policy or custom" must have contributed toward the constitutional violation."[28]

Neither party spends time in the briefs discussing the distinction between individual and official capacity claims; rather, they conflate the issues.  The Complaint, Pretrial Order, and response brief provide little clarity as to which claim or claims plaintiffs assert here.[29]  So the Court must "look to the substance of the pleadings and the course of the proceedings in order to determine whether the suit is for individual or official liability."[30]  Plaintiffs' allegations in the pleadings, the language in the Pretrial Order, and the substantive arguments in their response to the summary judgment motion compel the Court to treat their claims as encompassing both individual and official liability against these defendants. Therefore, the Court will address plaintiffs' claims against the defendants in their individual capacities, as well as any claim that may exist against Shawnee County.

## 1. Individual Capacity Claims

In *Harlow v. Fitzgerald*,[31] the Court explained that qualified immunity shields government officials from liability for damages incurred in the performance of discretionary functions as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable

---

[28] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978); *Graham*, 473 U.S. at 166; *Myers*, 151 F.3d at 1316.

[29] *See, e.g.*, Doc. 65, at 1 ("Plaintiffs brought this action against Shawnee County Commissioners, jail director Elizabeth Gillespie and jail employees Matthew Biltoft and David Tipton in their individual capacities.").

[30] *Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993).

[31] 457 U.S. 800, 818 (1982).

person would have known."[32]  Courts use an objective standard, evaluating the official's conduct in light of the state of the law at the time of the purported constitutional or statutory violation.[33]  The Court reviews summary judgment motions involving qualified immunity claims differently than standard summary judgment motions because of the purpose behind qualified immunity.[34]  Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."[35]

Upon a defendant's assertion of a qualified immunity defense in a summary judgment motion, plaintiff has a two-part burden.  Plaintiff must come forward with facts or allegations that the defendant's conduct was a violation of a clearly established constitutional or statutory right at the time of its occurrence and that the violated right was "clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right."[36]  The issue of immunity is a legal one and the Court may not avoid it by framing it as a factual issue.[37]

The Supreme Court counsels that before addressing the issue of qualified immunity, the Court must first consider: "Taken in the light most favorable to the party asserting the injury, do the facts

---

[32]  *Id.*

[33]  *Id.*

[34]  *See, e.g.,Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1311-12 (10th Cir. 2002).

[35]  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[36]  *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997); *see Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

[37]  *Lawmaster*, 125 F.3d at 1347.

alleged show the officer's conduct violated a constitutional right?"[38]  Here, plaintiffs allege Eighth

Amendment violations against the individual defendants.  The Tenth Circuit has stated:

> [W]e conclude that in this circuit a prisoner, whether he be an inmate in
> a penal institution after conviction or a pre-trial detainee in a county jail,
> does not have a claim against his custodian for failure to provide
> adequate medical attention unless the custodian knows of the risk
> involved, and is 'deliberately indifferent' thereto. . . . And the same
> standard applies to a claim based on jail suicide, i.e., the custodian must
> be 'deliberately indifferent' to a substantial risk of suicide.[39]

Therefore, in order to allege a violation of the Eighth Amendment due to failure to protect Stapleton

from suicide, the plaintiffs must prove that the individual defendants were "deliberately indifferent" to a

substantial risk of suicide.  Deliberate indifference is a higher standard than either simple negligence or

heightened negligence.[40]  The subjective component of the deliberate indifference standard requires that

the official "be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."[41]

### a.  Defendant Tipton

Plaintiffs allege that Tipton, a DOC guard, was deliberately indifferent to Stapleton by failing to

properly guard him.  However, in order to establish a constitutional violation, plaintiffs must show that

Tipton had knowledge of facts upon which he could infer that there was a substantial risk that Stapleton

would commit suicide.  Without such evidence, no constitutional violation is alleged.  Here, the plaintiffs

---

[38]  *Saucier*, 533 U.S. at 201.

[39]  *Barrie v. Grand County, Utah*, 119 F.3d 862, 869 (10th Cir. 1997).

[40]  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407-10 (1997).

[41]  *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998); *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

14

explicitly state in their response brief that: "David Tipton was not informed or aware that Anthony Stapleton had previously attempted suicide.  This information was not available to David Tipton while guarding Anthony Stapleton on the day of his suicide.  David Tipton was not informed that Anthony Stapleton's mother had called several days before his suicide and expressed her concern for Anthony Stapleton's possible suicide and safety."[42]

To show knowledge by Tipton, plaintiffs' rely on the testimony of Father Chontos, that Tipton recommended to Biltoft that Stapleton be placed back on Suicide Watch after his argument with another guard the morning of his suicide.[43]  There is a genuine issue of fact over whether Tipton's recommendation that Stapleton be placed on Suicide Watch that morning was based on Tipton's belief that Stapleton was a threat to himself, or was simply as a disciplinary precaution.  Father Chontos' testimony  is difficult to interpret because the proffered excerpts of his testimony lack sufficient context.  Plaintiffs proffer page 12 of a transcript, which is merely a question posed to Father Chontos, "I'll represent to you that Officer Tipton has reported that his desire to put Mr. Stapleton on suicide watch was in connection with a disciplinary function, not because he was concerned that Mr. Stapleton was going to kill himself.  Is that your . . . ."  This is the end of page 12, but rather than providing the next page, plaintiffs provide page 21, where Father Chontos states: "My understanding is he believed he should be moved to suicide watch because he was a threat to himself.  That was my understanding."

---

[42]   (Doc. 65, at 37-38.)

[43]   Plaintiffs also suggest, based on Myrick's testimony, that Tipton should have heard Stapleton state out loud that he was going to kill himself when he came downstairs from showering.  However, plaintiffs fail to develop this argument and fail to point to any evidence that Tipton actually heard this statement.  Construing the evidence in the light most favorable to plaintiffs, the evidence merely establishes that Myrick heard the statement, not that Tipton heard such a statement.  Myrick admits in his testimony that he did not alert any guard to Stapleton's statements.

When asked who told him that, Father Chontos replied that Tipton had on the day of the suicide.  It is unclear whether this testimony on page 21 is in fact a response to the question posed nine pages earlier, at page 9.

Tipton attests that he never told Father Chontos that Stapleton should have been moved to Suicide Watch because he was a threat to himself.  But even accepting as true plaintiffs' assertion, the only information known to Tipton before Stapleton's suicide, was that Stapleton had an argument with a guard that morning that upset him.  Plaintiffs have presented no evidence about suicidal risk factors that Stapleton may have displayed as a consequence of the argument with the guard.

Based on Myrick's testimony, plaintiffs suggest that Tipton heard Stapleton state that he planned to commit suicide after returning from the shower.  The record, however, only supports the conclusion that Myrick heard this statement.  There is no evidentiary support for plaintiffs' conclusory allegation that Tipton heard Stapleton make such a statement and ignored it.[44]

Even assuming that Tipton had knowledge of a substantial risk of suicide, if he "responded reasonably to the risk, even if the harm ultimately was not averted," he may avoid liability.[45]  Plaintiffs contend that Tipton did not act reasonably in response to the known risk because he: (1) was watching television during the time when Stapleton committed suicide; (2) allowed Stapleton to return to his cell from the shower unsupervised; (3) allowed Stapleton to cover his cell window; (4) failed to perform a headcheck as scheduled between 10:00 and 10:45 a.m.; and (5) should have checked on Stapleton every four minutes, rather than every fifteen, given the known risk.

---

[44]   *See supra* note 43.

[45]   *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

After learning of Stapleton's argument with the guard, Tipton reported the incident to Biltoft, and in accordance with jail policy, asked him to screen Stapleton for Suicide Watch.  Under the DOC Policy, Tipton had no authority to recommend movement of an inmate from Close Observation, but had a duty to report any behavior that exhibited suicidal risk factors to a supervisor.  Accepting plaintiffs' allegations as true, Tipton asked Biltoft to screen Stapleton for possible movement to Suicide Watch. The Court finds no genuine issue of material fact that this was a reasonable response to what Tipton actually knew at the time.  He complied with the policies in place at the DOC by reporting the argument to Biltoft, whether he reported because of disciplinary or suicide concerns.

All of the allegations against Tipton stem from his behavior after he asked Biltoft to screen Stapleton and after Biltoft concluded that Stapleton did not require movement to Suicide Watch. Therefore, Tipton's knowledge at that time was limited to the argument Stapleton had with the guard earlier that morning, which Biltoft had concluded was resolved.[46]  It is undisputed that Tipton conducted a 10 a.m. headcheck, which accounted for Stapleton.  It is also undisputed that sometime between 10:16 and 10:20 a.m., Tipton was summoned to Stapleton's cell, where he found him hanging. Accepting as true plaintiffs' allegations, Tipton was at most five minutes late in conducting his 10:15 headcheck.[47]

In addition, even if Tipton was watching television that morning, there is no evidence that he

---

[46]  *See, e.g.*, *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000) ("we must evaluate his actions in light of the information he possessed at the time").

[47]  See *Olson v. Bloomberg*, 339 F.2d 730, 738 (8th Cir. 2003), where the court explained that evidence of intentional delay could result in enough evidence to overcome summary judgment.  In that case, there was evidence that the guard intentionally did not perform a headcheck after the inmate told him he was going to commit suicide. There is no such evidence here that Tipton missed a 10:15 headcheck intentionally.  Further, any failure to conduct a check at 10:30 appears to be due to the discovery of Stapleton, and ensuing events.

was doing so to the detriment of Stapleton.  It is undisputed that Tipton was sitting at the guard station near Stapleton's cell when the suicide occurred and was available when Stapleton's cellmate summoned him.  Likewise, there is no support for the assertion that it would have been reasonable for Tipton to respond to the information he had at the time by checking on Stapleton every four minutes. The Policy specifically distinguishes between procedures applicable to  inmates in Suicide Watch and Close Observation.  Because inmates in Close Observation by definition do not pose an imminent threat of committing suicide, the distinction in procedures is not unreasonable as a matter of law, and Tipton was simply following that Policy.

The Court must only determine if it was unreasonable for Tipton to not supervise Stapleton when he returned from his shower, and if it was unreasonable to allow Stapleton to cover his window after returning from the shower.  The Court finds that these actions, if true, do not rise to the level of deliberate indifference as a matter of law.  Given Tipton's admitted lack of knowledge with regard to Stapleton's background, his conduct was at most negligent.  The record suggests that there was no written policy that required Tipton to supervise Stapleton after his shower.  Nor was there any written policy requiring Tipton to immediately respond when Stapleton covered the window to his cell.  Tipton testified that he believed Stapleton was covering his window because he was using the restroom. Tipton's inaction was not attributable to any indifference to some risk of suicide posed by Stapleton. Again, based on screenings that were made in accordance with the DOC's established policies and procedures, Stapleton was placed in Close Observation because he did not present an imminent threat of suicide.  As recently as the morning of his suicide, Tipton was told by his supervisor that there was no need for Stapleton to be transferred back to Suicide Watch.  Based on this knowledge, Tipton's

subsequent actions constituted a reasonable response.  Therefore, the Court finds that, taking the facts

in the light most favorable to plaintiffs, there is no claim that Tipton violated Stapleton's constitutional

rights.

### b.  Defendant Biltoft

Plaintiffs allege that Biltoft, Tipton's supervisor, was deliberately indifferent to Stapleton's

substantial risk of suicide by failing to: (1) listen to Tipton's recommendation to move Stapleton back to

Suicide Watch the morning of his suicide; (2) follow written policy the morning of Stapleton's suicide by

not conducting a formal screening; (3) brief Tipton on Stapleton's suicidal background and mother's

phone call; and (4) look at the guard notes and prior suicide screenings.  Plaintiffs further assert that

Biltoft failed to properly train or supervise Tipton.

Unlike Tipton, Biltoft was aware of Stapleton's suicidal background and that his mother was

concerned about his suicidal tendencies.  Biltoft met with Stapleton the morning of his suicide at

Tipton's request and determined that it was unnecessary to transfer Stapleton to Suicide Watch.  Biltoft

contends this conclusion was justified because Stapleton had calmed down and Biltoft was able to

reason with Stapleton about his concerns over the size of his jumpsuit.  Based on this, Biltoft concluded

that there was no need to conduct a screening or place Stapleton in Suicide Watch as a disciplinary

measure.  Plaintiffs have presented no evidence that controverts these facts underlying Biltoft's decision.


Aside from the statements of their expert, Plaintiffs have not presented evidence tending to

show that Stapleton's behavior should have led Biltoft to believe he presented a *substantial* risk of

suicide.  Plaintiffs' expert, Dr. Lofgreen, opines "[t]hat by decedent Anthony Stapleton previously trying

to commit suicide, his telling parties that he was going to commit suicide, the previous evaluations of Shawnee County Jail personnel, it appears that there was a strong likelihood that Anthony Stapleton would commit or attempt to commit suicide during his incarceration." It is unclear whether Dr. Lofgreen's opinion is admissible evidence, for plaintiffs do not provide any information about Dr. Lofgreen's qualifications or area of expertise.

Even if Stapleton's behavior was a sufficient basis for Biltoft to be aware of a substantial risk of suicide, Biltoft's response to that threat was reasonable. There was no DOC policy that required Biltoft to debrief Tipton on Stapleton's suicidal background; nor do plaintiffs present evidence that failing to present such information was unreasonable. Moreover, Biltoft did not ignore Tipton's request for Stapleton to be moved to Suicide Watch. Instead, he went to Stapleton's cell and spoke with him about his argument with the guard. According to Biltoft, this discussion with Stapleton was productive and Biltoft did not feel that there was a risk of suicide, nor a need to move him to Suicide Watch. Biltoft left after believing he had calmed Stapleton down. The fact that he did not fill out a screening form after this encounter does not evidence that his response was unreasonable.

Nor can Biltoft's behavior be deemed unreasonable because he failed to notice or consider the guard's notes that two days earlier, Stapleton had been crying. In fact, many of the notes referred to by plaintiffs actually state that Stapleton had improved and was not displaying suicidal risk factors. For example the November 27 Close Observation progress notes, two days before his suicide, stated that he had cried for awhile, but then calmed down. And the progress notes on November 28, the day before Stapleton's suicide, stated that he spent most of the day socializing with other inmates.

Finally, plaintiffs assert that Biltoft is liable because of his status as Tipton's supervisor and

trainer. "To establish a supervisor's liability under § 1983 [plaintiff] must show that 'an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'"[48]  The Court has already found that neither Tipton nor Biltoft's actions rise to the level of a constitutional deprivation.  Therefore, supervisory liability may not attach.

In sum, the behavior of Biltoft, as alleged by plaintiffs, does not amount to deliberate indifference to a substantial threat of suicide.  Plaintiffs have failed to show that Biltoft should have been aware of a substantial risk of suicide nor that Biltoft's actions were unreasonable. Even if Biltoft's conduct was grossly negligent, it does not rise to the level of a constitutional violation.  Therefore, the Court grants Biltoft summary judgment in his individual capacity.

### c.  Gillespie

Plaintiffs fail to allege the Gillespie, DOC Director of Corrections, had knowledge of any specific suicide risk to Stapleton.  Although plaintiffs allege that Gillespie should have inferred a risk of suicide, there is no evidence that Gillespie disregarded a known or obvious risk to Stapleton that was likely to result in the violation of his rights.  If a substantial risk may be inferred from circumstantial evidence, it may sufficiently demonstrate the requisite knowledge element.[49]

Plaintiffs argue that the occurrence of two other suicides at the DOC shows that Gillespie failed to supervise and failed to enforce the policies in place at that time.  However, plaintiffs have presented

---

[48]  *Green v. Branson*, 108 F.3d 1296, 1302  (10th Cir. 1997) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988)).

[49]  *See Gonzales v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005).

no evidence that the other two suicides at the DOC occurred prior to Stapleton's suicide, or were at all analogous to Stapleton's, so as to put Gillespie on notice that policies and procedures at the DOC contributed to an increased risk of prison suicides.  In contrast, the undisputed evidence shows that during the same year that Stapleton committed suicide, Gillespie had been proactive in consulting with a suicide expert and revamping the procedures at the DOC to distinguish between prisoners who were imminently suicidal and those who were not.  As a result, plaintiffs have failed to allege a constitutional violation by Gillespie.  Because plaintiffs have shown no evidence of knowledge by Gillespie of a substantial risk that Stapleton would commit suicide, the Court grants Gillespie summary judgment in her individual capacity.

### d.  Defendants Ensley, Kane, Miller

The specific allegations by plaintiffs against County Commissioners Ensley, Kane and Miller, primarily relate to an official capacity claim against the county; namely, that they instituted ineffective procedures to contend with prison suicides, and that they hired unqualified personnel.  Plaintiffs also suggest that the county commissioners and Gillespie failed to properly guard and supervise Stapleton.

Plaintiffs fail to allege that the commissioners had any actual knowledge of the suicide risk posed by Stapleton.  Plaintiffs' arguments about why liability should attach to the commissioners is entirely dependent on the allegation that they had knowledge of past suicides at the DOC yet never proactively instituted changes to prevent future suicides.[50]  Although this allegation may be relevant to an official capacity claim, it is at best an allegation of negligence against the county commissioners.  Furthermore, plaintiffs present absolutely no evidence regarding the other two suicides that occurred at

---

[50]  Indeed, the Complaint only alleges knowledge of Stapleton's suicide risk by employees of the DOC.

the DOC.  There is no indication about when these occurred,[51] whether they occurred in the Close

Observation Unit, or what response, if any, was made by Gillespie or the commissioners as a result.

Plaintiffs fail to allege a constitutional violation by the county commissioners in their individual capacities,

therefore the Court grants summary judgment.

## 2.  Official Capacity Claims

Plaintiffs' claims against the defendants in their official capacities is another way of suing

Shawnee County itself.[52]  As is the case with supervisory liability, "a municipality may not be held liable

where there was no underlying constitutional violation by any of its officers."[53]  In this case, the Court

has found that there was no constitutional violation by any of the prison officials, nor by the county

commissioners.  The Court found that these officials either lacked the requisite knowledge of a

substantial risk of suicide by Stapleton, or responded to that threat reasonably under the circumstances.

Therefore, the Court grants summary judgment to all defendants on both the individual and official

capacity claims under section 1983.

### B.  State Law Negligence Claim

Defendants further argue that they are entitled to summary judgment on the state law negligence

---

[51]   This is most important information because if these other suicides occurred after Stapleton's suicide,
they have little probative value.  The only way evidence of other suicides could be probative is if they had happened
before Stapleton's suicide, causing notice to defendants of a problem with their treatment of suicidal inmates.  *See
Daniels v. Glase*, 198 F.3d 257, 1999 WL 1020522, at *5 (10th Cir. Nov. 3, 1999) (unpublished table decision) (finding
no constitutional violation and noting that there had been no prior suicide attempts or successful suicides at the jail
that would alerted the sheriff of staffing problems).

[52]   *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

[53]   *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *see Jiron v. City of Lakewood*, 392 F.3d 410,
419 n.8 (10th Cir. 2004) ("when a finding of qualified immunity is based on a conclusion that the officer has
committed no constitutional violation–i.e., the first step of the qualified immunity analysis–a finding of qualified
immunity *does* preclude the imposition of municipal liability.").

claims because they are immune from suit under the KTCA.  Because the Court grants summary

judgment to defendants' on all of the federal claims, the Court is authorized to decline supplemental

jurisdiction over the remaining state law claims.[54]  Whether to exercise  supplemental jurisdiction is

committed to the court's sound discretion.[55]  28 U.S.C. section 1367 "reflects the understanding that,

when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh

in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness

and comity.'"[56]

      Upon a pretrial disposition of the federal claims, district courts will generally dismiss the state

law claims without prejudice.[57]  This general practice is in keeping with the holdings of the Supreme

Court and the Tenth Circuit.[58]  "Notions of comity and federalism demand that a state court try its own

lawsuits, absent compelling reasons to the contrary."[59]

      Here, the "compelling reasons" point in favor of state rather than federal court resolution of the

state law claims.  There is a dispute as to whether defendants' are immune from suit under the KTCA.

Determining whether these defendants are immune requires an analysis of not only the statutory

---

[54]  28 U.S.C. § 1367(c)(3).

[55]  *City of Chicago  v. Int'l Coll. of Surgeons*, 522 U.S. at 172-73 (1997); *see Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 541 (10th Cir. 1995).

[56]  *City of Chicago,* 522 U.S. at 173 (quoting *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union,* 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Commr's*, 365 F.3d 855 (10th Cir. 2004).

[57]  *Ball v. Renner,* 54 F.3d 664, 669 (10th Cir. 1995) (collecting cases); *see also Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1237 (10th Cir. 1997).

[58]  *Ball,* 54 F.3d at 669.

[59]  *Thatcher Enters. v. Cache County Corp.,* 902 F.2d 1472, 1478 (10th Cir. 1990).

exceptions to liability under the KTCA, but also whether any of these defendants owed a legal duty to Stapleton.[60]  In addition, the claims require an analysis of whether the tort of negligent supervision may apply, which is an unsettled area of Kansas law.  Where a state law cause of action is in a process of current evolution, it is particularly appropriate for the federal courts to leave the continuing development and application of that cause of action to the state courts.[61]

Further, plaintiffs are free to pursue their claims in a Kansas court because even if the statute of limitations would otherwise have run, 28 U.S.C. § 1367(d) tolls the statute of limitations during the time the claim is pending and affords them at least 30 days from a current federal court dismissal to commence a new action in the state court.[62]  In this case, because discovery  is complete, the Court conditions dismissal on use of all discovery  in any subsequently filed state court case.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 59) is **GRANTED** with respect to plaintiffs' section 1983 claims.

**IT IS FURTHER ORDERED** that because the Court declines to exercise supplemental jurisdiction in this case, plaintiffs' state law claims are dismissed without prejudice.

**IT IS SO ORDERED**.

Dated this  19th   day of August 2005.

---

[60]  *See, e.g.*, *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1184-88 (D. Kan. 2002) (analyzing state law negligence claims against officials at the DOC in a prisoner suicide case).

[61]  *Ball*, 54 F.3d at 669.

[62]  28 U.S.C. § 1367(d)**.**  *Cf. Jinks v. Richland County, S.C.*, 538 U.S. 456, 466-67 (2003) ("no constitutional doubt arises from holding that [a] claim against . . . a political subdivision of a State–falls under the definition of 'any claim asserted under subsection (a).'").  Kansas's "saving statute", K.S.A. 60-518, affords a plaintiff six months to commence a new action if a previous timely action failed "otherwise than upon the merits."  Examples of such failures include dismissal without prejudice. *See Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777 P.2d 836, 839 (Kan. 1989).  If applicable, this time frame controls over the 30-day tolling period in 28 U.S.C. § 1367(d).

  S/ Julie A. Robinson

Julie A. Robinson
United States District Judge